

by the New Jersey courts, we would have to extend the bounds of state law in order for Donegal to prevail on its theory of liability under Section 2–705. Such a step federal courts in a diversity action are reluctant to take.

The evidence here could not support a finding of a bailment relationship, and absent such a relationship, Accurate may not be held liable for disregarding Donegal's demand.

Accordingly, an order will be entered reversing the judgment of the district court.

Robert G. Mann, Steven H. Frank, Indianapolis, Ind., for defendants-appellants.

Stanley B. Miller, U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before PELL and SPRECHER, Circuit Judges, and PERRY, Senior District Judge.[*]

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Van Wert MULLIN et al., Defendants-Appellants.**

**Nos. 74–1874, 74–1876.**

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1975.

Decided May 27, 1975.

SPRECHER, Circuit Judge.

The only substantial question raised by this appeal is whether a "numbers" or policy operation involved the requisite five-or-more persons.

Seven persons (Mullin, Herring, Canady, Williams, Bryant, Bigsbee and Pasley) were charged in the indictment with conducting an illegal gambling business of pool-selling, policy and numbers contrary to State of Indiana laws in violation of 18 U.S.C. § 1955. At the beginning of the trial defendant Williams was dismissed from the case. Upon a bench trial, the remaining six defendants were found guilty. Bryant and Bigsbee each received a sentence of one year's probation and did not appeal.

Mullin and Herring were sentenced to six months' imprisonment and two and one-half years' probation. Canady was sentenced to 60 days' imprisonment and 34 months' probation. Pasley was sen-

---

[*] Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

tenced to 60 days' imprisonment and 22 months' probation. Mullin, Herring, Canady and Pasley have appealed.

18 U.S.C. § 1955(a) provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both."

Section 1955(b) provides in part that:

(1) "[I]llegal gambling business" means a gambling business which—

    (i) is a violation of the law of a State or political subdivision in which it is conducted;

    (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

    (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "[G]ambling" includes but is not limited to pool-selling . . . policy . . . or numbers games . . ..

Defendants Mullin, Canady and Herring admitted that the three of them conducted a numbers business in Indianapolis. In fact their brief candidly conceded that "[t]he evidence established that . . . Mullin was a numbers banker and that he employed . . . Herring and Canady as runners." What the four appealing defendants contended on appeal, however, was that the government failed to connect defendant Pasley or Pasley's admitted employee, Burney, to the operation involving the other three.

Several witnesses testified as to the method of operation of the numbers business enterprise. A bettor would select, at random, any four numbers from "0" through "9". He would place his bet with a writer. The writer would write a bet slip including the following information: his code in the upper right hand corner, the number bet, the amount and the date. The writer would then turn in the bet slips and 75 percent of the amounts of the bets to the pickup man. The pickup man would retain ten percent of the gross amount of the bets, and the remaining 65 percent of the bets and the bet slips would be delivered to the banker. The winning number would depend on the results of the stock market for the day—that is, the number of stocks which advanced in price, declined in price and remained the same. The winning dollar bet would receive a maximum prize of $2,250.

The evidence consisted primarily of hundreds of betting slips, adding machine tapes and so-called "bank pads," which were bound note pads from which the betting slips had been detached leaving a record for the writer of the bets. This evidence had been collected during searches of the residences of Mullin, Canady and Bryant on April 15, 1974, pursuant to search warrants. This documentary evidence established that the numbers enterprise was in existence at least from January 2, 1974, through April 12, 1974. Betting paraphernalia for this entire period appeared without any differences in form for particular times or periods within the three and one-half month term. This evidence further established that there were 50 or 60 separate bet writers during the period.

The appealing defendants' argument regarding the lack of connection between Mullin-Herring-Canady on the one hand and Pasley-Burney on the other, was based primarily on Mullin's statements to law enforcement officers that he began to bank this particular numbers operation in March 1974, and that he did not desire to do business with Pasley.

In regard to Mullin's statements about his commencing his participation in the enterprise in March, a calendar pad (Gov't Ex. 1) was obtained from Mullin's residence, showing the winning numbers for each day (except Saturdays and Sundays) from January 2 to April 12, 1974. The fact-finder, who was the district judge in this case, could have concluded that the numbers, particularly a very

distinctive style of writing the number "4", were written throughout the period by the same person in the same handwriting. So-called "cut cards" with betting data, dated December 10 (Gov't Exs. 6 and 7) were also found in Mullin's possession. A notebook with betting information obtained in Canady's residence (Gov't Ex. 32) contained dates ranging from February 4 to April 15. When considered together with the massive quantities of uniform paraphernalia covering the entire period of January-April, the judge could have concluded that Mullin was involved in the enterprise throughout that entire period.

In regard to Pasley's connection with Mullin-Herring-Canady, the witness Burney testified that she was employed at $15 per day by Pasley in the numbers business during the period January-April 1974. She further testified that during January and February 1974, she turned her bets over to Pasley at 1434 Herschell Street in Indianapolis where defendant Herring would also be present. On occasion, Pasley would not be there and she and Herring would wait together for him.

In addition to Burney's testimony, a government agent testified that during surveillances he observed Mrs. Burney at 1434 Herschell with Herring on February 7 and 21. On the 21st, Pasley's automobile was observed parked across the street from 1434 Herschell. On February 22, Pasley was also observed at the Herschell address.

There was no denial by Pasley that he was engaged in a numbers operation with Burney as his employee. He argued, however, that the February dates linking him to Herring occurred before Mullin commenced his participation in March. As we have noted, the court below heard evidence sufficient to connect Mullin with the enterprise during the entire January-April period. Consequently, the February evidence connecting Pasley and Burney with Mullin's associate, Herring, was sufficient to indicate that Pasley's operation was part of the Mullin-Herring-Canady operation. United States v. Hunter, 478 F.2d 1019, 1022 (7th Cir.,), cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973). This being so, the five-or-more persons requirement was met.

In addition, witness Primus testified that he was a writer or runner for Canady during the period involved. Defendant Bigsbee testified that for the period in question he acted as the driver for his grandfather, Canady, while he picked up bets and that he knew the function Canady was performing in the gambling operation.

We have held that runners, ticket sellers, telephone clerks, salesmen, lay-off bettors and watchmen may be counted to reach the required number of participants. United States v. McHale, 495 F.2d 15, 18 (7th Cir. 1974); United States v. Manson, 494 F.2d 804, 807 (7th Cir.), cert. denied, 419 U.S. 994, 95 S.Ct. 304, 42 L.Ed.2d 266 (1974); United States v. Hunter, *supra* at 1021–22. Primus was a runner or ticket seller or salesman. Bigsbee was a driver or chauffeur with knowledge that he was aiding and abetting an illegal gambling operation.

The record supports the conclusion that a well-organized and widespread gambling operation was conducted for at least three and one-half months. The evidence is sufficient to confirm a link between each defendant and at least four other conductors involved in the gambling business.

The judgments of conviction are affirmed.